**AUDUBON SOCIETY OF PORTLAND and Willamette Riverkeeper, Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE and U.S. Army Corps Engineers, Defendants.**

**Port of Portland, Intervenor.**

**No. 03:11–cv–00494–HU.**

United States District Court, D. Oregon, Portland Division.

July 29, 2011.

Daniel J. Rohlf, Lewis & Clark Law School, Portland, OR, for Plaintiffs.

Kevin William McArdle, U.S. Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, for Defendants.

Beverly C. Pearman, Peter D. Sax, Stoel Rives LLP, Portland, OR, for Intervenor.

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

HUBEL, United States Magistrate Judge:

This matter is before the court on the plaintiffs' Motion for Preliminary Injunction and supporting documents, Dkt. ## 5–8. The defendants have filed a response in opposition to the motion, Dkt. ## 19–22; the Intervenor has filed an opposition to the motion, Dkt. ## 14–18; and the plaintiffs have filed a reply, Dkt. ## 23, 24 & 28. The court heard oral argument on the motion on July 25, 2011, and took the motion under advisement at that time. Having considered all of the parties' briefs and declarations, and the arguments of counsel, I **deny** the motion.

## I. INTRODUCTION

On April 22, 2011, the plaintiffs Audubon Society of Portland and Willamette Riverkeeper filed a Complaint for Declaratory and Injunctive Relief against the defendants National Marine Fisheries Service ("NMFS")[1] and U.S. Army Corps of Engineers ("the Corps"). Dkt. # 1. The impetus for the filing of the Complaint is dredging activity scheduled to take place between river miles 2.1 and 2.4 on the Lower Willamette River between July 1 and October 31, 2011 (the "in-water work window" for that portion of the river).[2] The dredging action proposed by the Corps would remove some 75,000 cubic yards of sediment that has built up in the "Post Office Bar" area on the east side of the Willamette River, to return the channel in this location to its intended depth and width. The removed sediment would be transported by barge for disposal on West Hayden Island. According to the plaintiffs, the dredges "would work up to 7 days a week and 24 hours a day during one month of the in-water work window." Dkt. # 1, ¶ 33.

On May 13, 2010, NMFS issued a biological opinion (the "BiOp") on the proposed dredging. See Dkt. # 8, Jolliffe Decl., Ex. 2. In the BiOp, NMFS concluded the pro-

---

1. Although the parties refer to this defendant as the "National Marine Fisheries Service (NMFS)," the agency, which is part of the National Oceanic and Atmospheric Administration, is properly called the "NOAA Fisheries Service." See http://www.nmfs.noaa.gov/; see also Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv., Nos. CV 01–640–RE, CV 05–23–RE, 2005 WL 1278878, at *1 n. 1.

Nevertheless, because the parties refer to the agency as "NMFS," the court will use that designation in this opinion to avoid confusion.

2. "[T]he Corps has agreed not to commence any in-water work prior to the issuance of the Court's ruling on Plaintiffs' motion or August 1, 2011, whichever occurs first." Dkt. # 4, p. 2.

posed dredging action was not likely to jeopardize the continued existence of several species of salmon and steelhead currently listed as threatened species, or to damage their critical habitat. These species of fish, characterized by the plaintiffs as "evolutionarily significant units (ESUs)," include Upper Willamette River Chinook salmon (*Oncorhynchus tshawytscha*), Lower Columbia River Chinook salmon, Lower Columbia River steelhead (*O. mykiss*), Upper Willamette River steelhead, and Lower Columbia River coho salmon (*O. Kisutch*) (collectively, the "Pacific salmonids" or the "listed species"). *Id.*, cover letter; Dkt. # 1, ¶ 2.

In the plaintiffs' Complaint, they allege the Corps has a duty to comply with the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* ("ESA"), prior to authorizing any dredging activity that may affect "listed species or designated critical habitat." Dkt. # 1, ¶ 11. The plaintiffs allege the Corps violated the ESA and the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* ("APA"), "by failing to ensure that its approval of Post Office Bar dredging is not likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat." Dkt. # 1, ¶ 3.

The plaintiffs further allege that NMFS is "responsible for the lawful administration of the ESA with respect to anadromous fish, including those at issue in this case." Dkt. # 1, ¶ 10. The plaintiffs claim the BiOp issued by NMFS is "illegal," and NMFS has violated the ESA and APA by issuing the illegal BiOp. *Id.*

For these alleged violations, the plaintiffs seek the following relief:

> [T]hat the Court declare the Corps has failed to ensure that its approval of the Post Office Bar dredge project BiOp avoids jeopardy to listed ESUs and avoids destruction or adverse modification of designated critical habitat; hold

unlawful and set aside NMFS'[s] BiOp for this project and order NMFS to rescind the BiOp; order the Army Corps to reinitiate formal consultation with NMFS under Section 7 of the ESA; require NMFS to issue a valid BiOp for the Post Office Bar dredge project; and enjoin any dredging activity at Post Office Bar pending the Corps' and NMFS'[s] full compliance with the ESA.

Dkt. # 1, ¶ 4.

The plaintiffs have filed a motion for preliminary injunction to prevent the dredging action from going forward, and to prevent NMFS from authorizing any incidental taking of the Pacific salmonids, until the court has ruled on the merits of the plaintiffs' Complaint. Dkt. # 5.

## II. STATUTORY AND REGULATORY FRAMEWORK

The ESA was enacted in 1973 to conserve endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b) (noting "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction"). The ESA requires "all Federal departments and agencies" to use "*all methods and procedures which are necessary to bring any endangered species or threatened species* to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1531(c); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 2295, 57 L.Ed.2d 117 (1978) (emphasis in original). The Supreme Court observed that Congress's "plain intent" in enacting the ESA "was to halt and reverse the trend towards species extinction, whatever the cost. This is reflected ... in literally every section of the statute." *Id.,* 437 U.S. at 184, 98 S.Ct. at 2297. The Supreme

**1020**

Court has observed that the mandates of the ESA are to be afforded the highest priority by federal agencies. *Id.,* 437 U.S. at 185, 98 S.Ct. at 2297 ("[T]he legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species.").

Pursuant to section 7 of the ESA, in any non-exempt action where there is discretionary federal involvement or control, the involved federal agencies are required to consult with "the Secretary"[3] to ensure that the agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species ... us[ing] the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.03. The term "[j]eopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. In using the "best scientific and commercial data available," the agency is prohibited "from disregarding available scientific evidence that is in some way better than the evidence [it] relies on," and it "cannot ignore available biological information." *Kern County Farm Bur. v. Allen,* 450 F.3d 1072, 1080–81 (9th Cir. 2006) (internal quotation marks, citations omitted).

Judge James A. Redden of this court explained the requirements of this agency "consultation" in *National Wildlife Federation v. NMFS,* Nos. 01–cv–640, 05–cv–23, 2005 WL 1278878 (D.Or. May 26, 2005), *aff'd* 524 F.3d 917 (9th Cir.2008) ("*NWF I* "):

During a section 7 consultation, the consulting agency must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). The agency must "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.*

"Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. "Effects of the action" are "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." [*Id.*]

The environmental baseline "includes all past and present impacts [on listed species and their critical habitat] of all Federal, State, private, and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are con-

---

**3.** Under the ESA, the term "Secretary" may refer to the Secretary of the Interior, the Secretary of Commerce, or sometimes the Secretary of Agriculture, depending on which program or proposed action is involved. 16 U.S.C. § 1532(15). NOAA and NMFS are subagencies of the United States Department of Commerce, and the Secretary of Commerce is responsible for overseeing their administration of the ESA with regard to the anadromous salmonids at issue in this case. *See id.;* note 1, *supra;* 50 C.F.R. § 402.01(b).

temporaneous with the consultation in process." [Id.]

NWF I, 2005 WL 1278878, at *6.

Judge Redden further explained that if the biological opinion, or "BiOp," required by section 7 concludes that a proposed agency action "will jeopardize a listed species, the opinion must include the reasonable and prudent alternatives to the agency's action plans." NWF I, 2005 WL 1278878, at *5.

A biological opinion "should address both the jeopardy and critical habitat prongs of Section 7 [of the ESA], by considering the current status of the species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the proposed action." Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service, 378 F.3d 1059, 1063 (9th Cir.2004) (citing 50 C.F.R. § 402.14(g)(2)-(3)).

NWF I, 2005 WL 1278878, at *6. "Reasonable and prudent alternatives refer to alternative actions identified during formal consultation ... that [are] economically and technologically feasible, and that the [consulting agency] believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

The "jeopardy analysis" the BiOp is required to address "include[s] viewing the proposed action against 'the aggregate effects of everything that has led to the species' current status, and, for non-Federal activities, those things likely to affect the species in the future.'" Id. (quoting Endangered Species Consultation Handbook—Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act, at 4–35 (1998) (the "Consultation Handbook")). The Consultation Handbook notes that with certain exceptions not relevant here,

"[A] jeopardy opinion is rendered when the total of the species' status, environmental baseline, effects of the proposed action, and cumulative effects lead to the conclusion that the proposed action is likely to jeopardize the continued existence of the entire species, subspecies, or vertebrate population as listed."

Id. (quoting the Consultation Handbook at 4–36). In other words, a jeopardy opinion is warranted when agency actions are likely to jeopardize an entire listed species or an entire critical habitat.

Section 9 of the ESA makes it unlawful to "take" any endangered species of fish or wildlife except under certain circumstances. 16 U.S.C. § 1538(a)(1)(B). To "take" a species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). A "taking" may be permitted if it "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," but only after the applicant for such a permit submits a conservation plan that is approved by the Secretary. 16 U.S.C. § 1539(a)(2)(A).

When a proposed taking is by a federal agency, the Secretary may allow an "incidental taking" if, after consultation with the federal agency, the Secretary concludes that the proposed agency action either will not jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the habitat of such species (collectively, the "adverse impact"), or that the agency action "offers reasonable and prudent alternatives which the Secretary believes would not [cause the adverse impact]; and that "the taking of an endangered species or a threatened species incidental to the agency action will not [result in the adverse impact]." 16 U.S.C. § 1536(a)(2) & (b)(4). An Inciden-

tal Take Statement ("ITS") issued by the Secretary is a written statement that:

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measure that are necessary to comply with section 1371(a)(5) of [title 16 USC] with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4). The ITS "functions as a safe harbor provision immunizing persons from [ESA] liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, B.L.M.*, 273 F.3d 1229, 1239 (9th Cir.2001) (citing 16 U.S.C. § 1536(*o*)).

The Ninth Circuit has noted that generally, an ITS establishes "a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation. Ideally, this 'trigger' should be a specific number." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1249 (citing cases where the ITS specified a specific number; *e.g., Fund for Animals, Inc. v. Rice*, 85 F.3d 535 (11th Cir.1996) "(municipal landfill may take fifty-two snakes during construction and an additional two snakes per year thereafter)"). However, the court further noted that although "Congress indicated its preference for a numerical value, it anticipated situations in which impact could not be contem-

plated in terms of a precise number." *Id.*, 273 F.3d at 1250 (citations omitted). A numerical limit is not an absolute requirement, and the court has upheld ITSs "that used a combination of numbers and estimates." *Id.*, 273 F.3d at 1249 (citing cases). Ecological conditions may be used "as a surrogate for defining the amount or extent of incidental take ... so long as these conditions are linked to the take of the protected species." *Id.*, 273 F.3d at 1250 (internal quotation marks omitted). The court found this use of a "surrogate" to be consistent with the provisions of the Consultation Handbook:

"When preparing an incidental take statement, a specific number (for some species, expressed as an amount or extent, e.g., all turtle nests not found and moved by the approved relocation technique) or level of disturbance to habitat must be described. Take can be expressed also as a change in habitat characteristics affecting the species (e.g., for an aquatic species, changes in water temperature or chemistry, flows, or sediment loads) where data or information exists which links such changes to the take of the listed species. In some situations, the species itself or the effect on the species may be difficult to detect. However, some detectable measure of effect should be provided.... [I]f a sufficient causal link is demonstrated (i.e., the number of burrows affected or a quantitative loss of cover, food, water quality, or symbionts), then this can establish a measure of the impact on the species or its habitat and provide the yardstick for reinitiation."

*Id.* (quoting the Consultation Handbook at 4–47 to 4–48). The court explained that "[b]y 'causal link' we do not mean that the [agency] must demonstrate a specific number of takings; only that it must establish a link between the activity and the taking

of species before setting forth specific conditions." *Id.*

This statutory and regulatory framework provides the foundation upon which the parties base their arguments.

## III. HISTORICAL BACKGROUND

As background for the reason the ESUs in this case are facing extinction, the plaintiffs set forth the following history which has not been challenged by the defendants:

The Willamette River and the habitat it provides for threatened salmon and steelhead are fundamentally degraded and altered from historic conditions. Since the 1970s, development began to strip away the riparian forests surrounding the river, resulting in large functional losses to the river's complexity and productivity and reducing the amount of habitat crucial for salmon and steelhead. Once highly braided and complex, the Willamette River system was also dramatically simplified through activities such as channelization and the placement of bank stabilizing "revetments." [4] The river banks are now lined with more than 96 miles of revetments, about half of which the Corps constructed. These activities and the resulting impacts reduced available salmonid rearing

habitat by as much as 75%. Moreover, thirty-seven dams in the basin now block salmonid access to more than 435 miles of important stream and river spawning habitat in the Willamette Basin, and altering temperature regimes in the Willamette River and its tributaries. Finally, while human civilization has advanced in the region, water quality, salmon and steelhead and their habitat have suffered further due to agriculture, urbanization, mining, and timber harvest; adverse impacts from the river dredging and associated industrial activities resulted in additional additive harm.

Dkt. # 6, pp. 6–7; *see* Dkt. # 8, Jolliffe Decl.[5], Ex. 5, a Corps summary of NMFS's July 11, 2008, BiOp, entitled "Supporting fish recovery in the Willamette Valley" (May 2010).

The plaintiffs note that NMFS issued a BiOp on February 23, 2004, that examined "all basins in Oregon with anadromous fish use … or designated critical habitat." Dkt. # 6, p. 7 (citing the Feb. 23, 2004, BiOp (the "2004 BiOp") at 6, Dkt. # 28, Ex. 1, p. 6). The plaintiffs point to the following findings NMFS made in the 2004 BiOp:

[N]ot all of the biological requirements of the listed and proposed species for

---

4. "Revetments" are "[f]ortified riverbanks intended to keep the river from meandering." Dkt. # 8, Jolliffe Decl., Ex. 4, Executive Summary of 2008 Willamette Project Biological Opinion, at p. 4 n. 1.

5. Michael Jolliffe is a recent graduate of Lewis & Clark Law School, where he "worked with the Pacific Environmental Advocacy Center, the law school's environmental law clinic," where the majority of his work was "on cases related to protection and conservation of salmon and steelhead in the Columbia River Basin[.]" *Id.*, ¶ 2.

In the present case, Jolliffe was asked to assess the extent to which NMFS, in its consideration of whether a proposed agency action on the Willamette and lower Columbia

Rivers will adversely impact the ESUs and their critical habitat, "considers impacts on the listed species and designated critical habitat stemming from previous federal agency actions affecting these same ESUs and critical habitat." *Id.*, ¶ 5. In making his assessment, Jolliffe compiled a list of relevant NMFS BiOps issued since January 1, 2005, and he considered each of them in detail, summarizing his findings in his Declaration, Dkt. # 8.

The defendants do not challenge Jolliffe's representations regarding the previous BiOps. To the extent Jolliffe merely sets forth the results of his research, and does not attempt to offer expert opinion regarding scientific matters, the court accepts his factual representations as true for purposes of the plaintiffs' motion for preliminary injunction.

freshwater habitat in general, water quality in particular, are being met under the environmental baseline in many streams and watersheds occupied by listed salmon and steelhead in Oregon. Their status is such that there must be a significant improvement[ ] in the environmental conditions they experience, over those currently available under the environmental baseline, to meet the biological requirements for survival and recovery of these species. Any further degradation of these conditions would significantly reduce the likelihood of survival and recovery of these species due to status of the environmental baseline. Dkt. # 28, Ex. 1, p. 24. Notably, however, the project considered in the 2004 BiOp was for a much larger and more diverse area than the Post Office Bar dredging project, and it concluded there would be improvements to the entire project area over a period of years.

The plaintiffs conducted a comprehensive search and compiled a listing of all BiOps issued by NMFS "that consider projects likely to adversely affect ESUs in the Willamette Basin and lower Columbia River" between January 1, 2005, and the May 13, 2010, BiOp at issue in this case. Dkt. # 8, Decl. of Michael Jolliffe, ¶ 5 & Ex. 3. The listing compiled by the plaintiffs includes 151 NMFS BiOps in which NMFS "assessed adverse impacts on upper Willamette chinook and steelhead … [and in some instances] also assessed impacts on threatened lower Columbia steelhead, chinook and coho." *Id.*, ¶ 7 & Ex. 3. According to Mr. Jolliffe, the adverse impacts found by NMFS in these BiOps "included further losses of riparian vegetation and increases in turbidity; increased release of chemical contaminates, adverse effects on the food base, and increased predation rates; restrictions of fish passage; and adverse effects on juvenile salmonids in the project area." *Id.*

The plaintiffs assert that of these 151 BiOps, there was only one, a July 11, 2008, BiOp (the "2008 Jeopardy BiOp"), in which NMFS made a finding of jeopardy. *Id.; see id.*, Ex. 4, "Executive Summary [of the] 2008 Willamette Project Biological Opinion," issued by NMFS on July 11, 2008. The BiOp specified that "the action area for purposes of the consultation includes the entire Willamette River downstream from the Corps' 13 Willamette Project dams, as well as 20 miles of the Clackamas and Molalla Rivers above their confluence with the Willamette." Dkt. # 8, Jolliffe Decl., ¶ 7 & Ex. 6.

In an introduction to its Executive Summary of the 2008 Jeopardy BiOp, NMFS described its findings and the action taken as a result of those findings as follows:

The National Marine Fisheries Services (NMFS) completed a consultation with the U.S. Army Corps of Engineers, Bonneville Power Administration, and the Bureau of Reclamation (Action Agencies) on July 11, 2008, on the impact of the Willamette River Basin Project on species listed for protection under the Endangered Species Act. NMFS found that the Action Agencies' Proposed Action alone was not sufficient to avoid jeopardy or adverse modification of critical habitat for two species: Upper Willamette River chinook salmon and the Upper Willamette River steelhead, and would destroy or adversely modify their critical habitat.

As a result, NMFS provided additional measures to mitigate for the projects' effects. These measures include fish passage at three dams, temperature control downstream of another dam, changes in downstream flows, screening of irrigation diversions, improved hatchery practices and facilities and habitat improvement projects. NMFS concluded that with the additional measures and

timelines, combined with the Proposed Action, the Willamette Project could be operated and maintained without threatening the continued existence of the two Upper Willamette River salmonid species or destroying their critical habitat. NMFS'[s] decision means that the species should survive, with an adequate potential for the species' recovery.

This summary of NMFS'[s] Willamette River Project biological Opinion captures major elements of the Action Agencies' Proposed Action, NMFS analysis, and the resulting "reasonable and prudent alternative" actions. The Biological Opinion, issued by NMFS on July 11, 2008, contains detailed analyses undertaken in making its determination. *Id.*, Ex. 4, p. 3.

According to the plaintiffs, the "reasonable and prudent alternative" ("RPA") specified by NMFS "will take many years and millions of dollars to fully implement." [6] Dkt. # 6, p. 9 (citing Dkt. # 8, Jolliffe Decl., ¶ 7). In addition, the 2008 Jeopardy BiOp established "a detailed organizational structure" to oversee implementation of the RPA, with the Corps and NMFS being "part of each element of this structure." *Id.; see* Dkt. # 8, Jolliffe Decl., Ex. 7 (setting forth a diagram of the organizational structure).

Jolliffe's review of NMFS BiOps revealed thirty-three BiOps issued in connection with Willamette River projects between the 2008 Jeopardy BiOp and the Post Office Bar BiOp at issue in this case. Dkt. # 8, Jolliffe Decl., ¶ 8. According to Jolliffe, none of those BiOps included any assessment or consideration of whether the RPA is being or has been implemented, and if so, to what extent, nor did NMFS consider "the additive impacts of

previously authorized federal projects on listed ESUs and their critical habitat in assessing whether the proposal under consideration was likely to jeopardize listed ESUs or destroy or adversely modify designated critical habitat." *Id.*, ¶¶ 9 & 10; Dkt. # 6, p. 9.

In his review of the thirty-three BiOps issued since July 11, 2008, Jolliffe found that NMFS had used very similar or even identical language to describe the status of affected ESUs. According to Jolliffe, NMFS repeatedly quoted from a 2007 study that concluded "[n]umbers of spring chinook salmon in the Willamette River basin are extremely depressed." *Id.*, ¶ 10 (citation omitted). Jolliffe states the language in the Post Office Bar BiOp that discusses the status of Upper Willamette River chinook salmon "is the same as it was in the 33 BiOps that preceded it, with no mention of how the additive impacts of the federal projects evaluated in those previous projects collectively affected the status of [the] chinook and their critical habitat, for better or worse." *Id.* The narrative language indicates the chinook salmon have "a high risk of extinction, and ... their critical habitat [is] severely degraded." *Id.* However, the BiOp does not "include any measurement of the additive impacts of projects for which NMFS had previously issued biological opinions [or incidental take statements] for federal projects that affected the same species." *Id.*

Jolliffe further states that in none of the thirty-three BiOps since 2008, has NMFS "made any effort to assess incidental take it has previously authorized and either quantified numerically or estimated using a surrogate, in assessing whether additional take would jeopardize the continued

6.  The plaintiffs state the BiOp for the Corps' operation of the Willamette Project dam system was issued on May 11, 2008, rather than July 11, 2008. This appears to be an error, as the Executive Summary itself specifies the date of the BiOp as July 11, 2008. *See* Dkt. # 8, Jolliffe Decl., ¶ 7 & Ex. 4, p. 3.

existence of listed ESUs[.]" *Id.*, ¶ 11. According to Jolliffe, the most recent quantitative data cited in the thirty-three BiOps dealing with population numbers of the ESUs at issue is from 2007; there is no scientific quantitative data cited relating to population numbers of the ESUs since the 2008 Jeopardy BiOp was issued. *Id.*, ¶ 12.

Turning to the proposed action at issue here, the parties agree that sediment has built up on the east side of the lower Willamette River at the Post Office Bar. The Corps proposes to dredge the river to remove about 75,000 cubic yards of sediment. In the defendants' brief, they describe the proposed dredging action in some detail, relying primarily on the Declaration of Sheryl Carrubba,[7] Dkt. # 22. According to Carrubba, the shoal at the Post Office Bar has increased approximately ten inches in the period from June 2010 to January 2011, and approximately five feet since the Post Office Bar was last dredged in 1989. *Id.*, ¶¶ 5 & 8 & Ex. 1, p. 5; Exs. 9 & 10. Carrubba stated that "[i]n 2008, the Corps determined that the lack of maintenance dredging at Post Office Bar was presenting an increasing hazard to navigation and was impacting access to Willamette River terminals and berths." *Id.*, ¶ 5. She cites the Corps' May 6, 2011, Final Environmental Assessment ("EA") for the project as the best description of navigation hazards and safety concerns represented by the increased shoaling and lack of maintenance. *Id.* The EA is attached to Carrubba's Declaration as Exhibit 2. In the EA, the Corps stated the

following regarding the condition of the Post Office Bar, and the need for maintenance dredging in the area:

The U.S. Army Corps of Engineers (Corps) is proposing to dredge a significantly shoaled area called Post Office Bar, located between Willamette River mile (WRM) 2 and 3 in the lower Willamette River federal navigation channel (LWR FNC). The entire LWR FNC is almost 12 miles long and extends from the mouth of the Willamette River to the Broadway Bridge in Portland, Oregon [citation omitted]. The purpose of the proposed dredging project at Post Office Bar is to restore the 40–foot channel depth to allow for safe passage of deep-draft vessels that transport goods to and from some portions of Portland Harbor.

Channel maintenance at Post Office Bar is needed because a significant amount of shoaling has taken place since the channel in this location was last dredged in 1989. Post Office Bar poses a problem for outbound vessels because it occurs on an inside bend on the east bank of the river. The lack of maintenance dredging in this area presents a hazard to navigation and impacts access to LWR terminals and berths. Over 1,100 vessels transited past this shoal in 2008. Because of increasingly shallow depths, vessels are forced to transit at high tide only. With the high volume of traffic and timing constraints due to tidal influence, the potential for daily head-on encounters is greatly increased. The reduced channel width from shoaling in

---

**7.** Sheryl Carrubba has been employed by the Corps for about twenty-five years, currently serving, since 2004, as "Operations Manager, Channels and Harbors Project, Operations Division, Portland District[.]" Dkt. # 22, ¶ 1. She has coordinated dredging activities for the Corps, including budgeting, operations management of "hopper dredges and other floating plant (e.g., survey boats), and person-

nel for these activities." *Id.*, ¶ 2. Since 2008, her responsibilities have included oversight of personnel involved in the proposed Post Office Bar dredging, management of the project, and environmental coordination for the project. *Id.* The court accepts Carrubba's factual representations as true for purposes of the plaintiff's motion for preliminary injunction.

this area is especially dangerous because vessels moving around the bend in the river must orient the vessel at an angle. This maneuver requires more channel width than when the same vessels are transiting a straight stretch. Ships transiting this river bend also have to increase power to make the shoal-restricted turn. This increased speed creates a stronger likelihood that ships moored at the nearby T5 terminal could be pulled away from the dock. This can be damaging to the moored vessel, dangerous to work crews, and increase the risk of damage or loss of equipment and shipped goods as they are moved to or from the shore.

Large deep-draft vessels are now at the point of having to use the area as if it were a one-way channel or resort to a tug boat assisted transit. However, smaller vessels such as barges, tugs and recreational boats are still using the area and their presence narrows the usable path that the larger ships have available to maneuver the turn, and also increases the possibility of a potentially lethal collision or a high-energy ship grounding which could crack a ship's hull. The Columbia River Pilots have expressed grave concerns about this increasingly hazardous area and have specifically requested that the Corps dredge as soon as possible. Every year that the area goes without dredging the channel becomes narrower and shallower, increasing the danger of a high-energy ship grounding or collision. Such an accident could have devastating environmental, economic, and social impacts. The shoal continued to accumulate an additional 10 inches of sediment between Corps hydrographic surveys taken in June 2010 and January 2011. The most recent survey shows shoaling shallower

than 34 feet in the 40-foot navigation channel.

*Id.,* Ex. 2, p. 1.

The defendants note that the area of the proposed dredging lies within a designated Superfund site within Portland Harbor, and "both the dredged and newly-exposed surface material will contain concentrations of chemicals." Dkt. # 19, p. 7 (citing Dkt. # 22–11, p. 2; Dkt. # 22–2, p. 16). However, they further state that "because Post Office Bar is a depositional area, new, cleaner material is expected to cover the exposed surface relatively quickly." *Id.* In addition, the Corps has "incorporated numerous protective measures into the project to minimize the potential for adverse environmental impacts, including impacts on threatened salmon and steelhead." *Id.* (citing Dkt. # 22–2, pp. 16–18; Dkt. # 22–12, pp. 5–10). Among other things, these protective measures include the following: (1) the dredging project will occur during the in-water work window, "when few salmonids are expected to be in the project area"; *id.* (citing Dkt. # 22–2, p. 16); (2) the dredging activity "is limited to one month"; *id.* (citing Dkt. # 22–11, p. 4; Dkt. # 22–12, p. 1); (3) "[a] close-lipped 'clamshell' dredge must be used to minimize turbidity and reduce sediment drift during dredging"; *id.* (citing Dkt. # 22–11, p. 3); (4) dredging will occur first in the areas with the highest chemical concentrations "to prevent contamination of cleaner areas and minimize downstream impacts"; *id.* (citing Dkt. # 22–2, p. 17); (5) "[i]f listed salmonids are observed in distress or killed during dredging activities, dredging operations will immediately cease and NMFS will be notified"; *id.* (6) "[a]ll dredged material must be placed in watertight transport barges to avoid discharge during transport"; *id.* (citing Dkt. # 22–11, p. 3); (7) "dredged material will be transported to an existing upland facility where it will be contained by dikes and

managed to prevent it from moving outside the site boundary"; *id.;* and (8) "[p]lacement of material at the upland disposal site will not affect any aquatic species or habitat." *Id.; see* BiOp at 3–4.

The defendants note that when NMFS issued the May 13, 2010, BiOp, it defined an "action area" that not only included the 0.3–mile stretch encompassing the Post Office Bar (i.e., the area between River Miles ("RM") 2.1 and 2.4), it included the entire area from the Willamette River's confluence with the Columbia River to RM 2.9, "to encompass[ ] the full geographic extent of any direct or indirect effects of the project." Dkt. # 19, p. 8 (citing the BiOp, p. 4). The defendants argue NMFS used "the best available science" to review the status of the affected salmonids and their habitat, evaluated the environmental baseline of the species in the action area, evaluated "the effects of the action and cumulative effects," and "concluded that the project is not likely to jeopardize the continued existence of any listed species or degrade critical habitat." *Id.* (citing the BiOp, pp. 6–21).

The defendants state that because NMFS found "only a small number of individual juvenile salmonids are likely to be harmed by the project," it included an ITS that estimates the amount or extent of incidental take. NMFS was unable to determine a specific number of fish likely to be taken, so it "used two surrogates to estimate take: dredging duration and anticipated turbidity levels." *Id.* (citing the BiOp, p. 22). "The ITS contains monitoring requirements to ensure that the surrogate take levels are not exceeded, and other terms and conditions to minimize the impact of any take." *Id.* (citing the BiOp, pp. 23–26). The Corps made an independent determination that no significant impact would occur to the listed salmon or steelhead "given the minimal geographic scope and duration of the project and the many protective measures." *Id.* (citing Dkt. # 22–2, pp. 44–46, 53; Dkt. # 22–11, pp. 4–5, 7).

### *IV. THE MAY 13, 2010, BiOp*

In October 2008, the Corps submitted a letter and a biological assessment to NMFS regarding the proposed maintenance dredging action at the Post Office Bar. The Corps had concluded that the proposed action likely would have adverse effects on the Pacific salmonids at issue in this case, and also affect the species' critical habitat. BiOp at 1. Historically, the last dredging action in the area took place in 1997. Maintenance dredging was begun in 2000, but the action was suspended because Portland Harbor was designated as a Superfund site. Since 2000, significant shoaling has occurred at the Post Office Bar, and the Columbia River Pilots "have requested that the Corps dredge this area since it poses a problem for outbound vessels because it occurs on an inside bend in the river." BiOp at 2.

In proposing the action, the Corps listed eight measures they would take to reduce adverse effects on the ESUs and their habitats. *See* BiOp at 3–4, summarized *supra.* NMFS relied on the Corps' description of these preventative measures and the Corps' description of the proposed action in completing its consultation. BiOp at 4. The "action area" identified by NMFS "is the Willamette River, extending 0.5 miles upstream from the dredging (RM 2.9) and downstream to the confluence with the Columbia River[,] ... based on the possible extent of turbidity and contaminant dispersion due to dredging during a complete tidal cycle." *Id.*

In the BiOp, NMFS noted that to complete its jeopardy analysis, it "reviewed the status of each listed species considered in [the] consultation, the environmental baseline in the action area, the effects of the action, and cumulative effects." BiOp

at 5 (citation omitted). For its critical habitat adverse modification analysis, "NMFS considered the status of the entire designated area of the critical habitat considered in [the] consultation, the environmental baseline in the action area, the likely effects of the action on the function and conservation role of the affected critical habitat, and cumulative effects." *Id.* NMFS considered whether, if the proposed action went forward, "critical habitat would remain functional, or retain the current ability for the primary constituent elements (PCEs) to become functionally established, to serve the intended conservation role for the species[.]" *Id.* (citing a 2005 memorandum from William T. Hogarth to Regional Administrators, Office of Protected Resources, NMFS, Regarding Application of the "Destruction or Adverse Modification" Standard Under Section 79(a)(2) of the ESA (Nov. 7, 2005)).

NMFS explained that it considers the current condition of the listed species "using criteria that describe a 'viable salmonid population' (VSP)." BiOp at 6.

> Attributes associated with a VSP include abundance, productivity, spatial structure, and genetic diversity that enhance [the species'] capacity to adapt to various environmental conditions and allow it to sustain itself in the natural environment. These attributes are influenced by survival, behavior, and experiences throughout the entire life cycle, characteristics that are influenced in turn by habitat and other environmental conditions.

*Id.* Using these criteria, NMFS identified a number of "major factors limiting the recovery" of the Lower Columbia River Chinook salmon, noting that a 2007 viability status report estimated the population was in the "extirpated or nearly so" persistence category. *Id.* NMFS indicate the LCR Chinook salmon population is "at high risk," and "[f]urther habitat changes

in the Willamette River and in the Columbia River mainstem and estuary would likely have a significant effect on fall Chinook salmon." *Id.* (citing McElhany, P., M. Chilcote, J. Myers, R. Beamesderfer, "Viability Status of Oregon Salmon and Steelhead Populations in the Willamette and Lower Columbia Basin" (Sept. 2007), a report prepared for the Oregon Department of Fish and Wildlife, and the National Marine Fisheries Service, NOAA Northwest Fisheries Science Center, Seattle) ("McElhany 2007").

Regarding the Upper Willamette River spring-run Chinook salmon, NMFS found their numbers to be "extremely depressed." BiOp at 7 (citing McElhany 2007). NMFS noted the species has "been adversely affected by the degradation and loss of spawning and rearing habitat (loss of 30 to 40%) associated with hydropower development, and interaction with a large number of natural-spawning hatchery fish." *Id.* Other major factors limiting the recovery of this species also were noted. *See id.* NMFS noted the McElhany 2007 study found the risk of extinction of this species to be high. *Id.*

With regard to the Lower Columbia River coho salmon, NMFS noted that in general, the 25 populations that existed historically in the Columbia River basin from the Hood River downstream "have been in decline for the last 75 years." *Id.* Historically, the numbers of wild coho returning "was at least 600,000 fish," while "[a]s recently as 1996, the total return of wild fish may have been as few as 400 fish." *Id.* However, in the past five years, the numbers of wild coho in the Clackamas, Sandy, Scappoose, and Clatskanie Rivers have increased moderately. *Id.* NMFS identified several major factors limiting recovery of the LCR coho salmon, and stated "the risk of extinction for coho in Oregon remains high." BiOp at 7–8.

NMFS conducted a similar analysis with regard to the Upper Willamette River and Lower Columbia River steelhead, concluding the risk of extinction of both species is "moderate." BiOp at 8–9.

In considering the critical habitat of all of the listed species, NMFS found "the value of critical habitat for salmon and steelhead is limited by poor water quality, altered hydrology, lack of floodplain connectivity and shallow-water habitat, and lack of complex habitat to provide forage and cover." BiOp at 10. NMFS noted other factors likely to have "negative implications for the conservation value of designated critical habitats in the Pacific Northwest" including climate change, urban development, and industrial harbor and port development, all of which will affect the designated critical habitats to some degree. BiOp at 9–11.

In determining the environmental baseline for the action area, NMFS noted the Post Office Bar site is within a designated Superfund site, "and is downstream from many sources of industrial contamination. In addition, the river receives direct inputs of treated municipal wastes and industrial effluents that may contribute to the contamination of the river." BiOp at 11. However, NMFS described vibra-core sampling of sediment at the Post Office Bar conducted on February 11, 2009, that indicated "material that would fill in the dredged channel is relatively clean and would accumulate relatively quickly." *Id.* NMFS noted that habitat conditions are "highly degraded" in the Lower Willamette River due to channelizing of streambanks, diking and filling of connected channels and wetlands, and other factors. "Both juvenile and adult Chinook salmon, coho salmon, chum salmon, and steelhead use the dredging area as a migratory corridor and as rearing habitat for juveniles." BiOp at 12; *see* BiOp at 11–13.

Regarding the effects of the proposed action, NMFS indicated the action "will affect the salmonid species considered in [the BiOp] by causing physical, chemical, and biological changes to the environmental baseline, and through direct effects ... includ[ing] interaction with fish migrating through or rearing within the action area during dredging, effects to benthic and pelagic forage opportunities, and short-term negative water quality effects (turbidity and increased exposure to contaminants)." BiOp at 14. NMFS noted that both salmon and steelhead will be present in the area when the dredging occurs, and therefore their migration "may be delayed and fish will likely avoid the project vicinity." BiOp at 16. If they are delayed in areas where cover and forage are unavailable, "then the delay will mean greater risk of predation, increased exposure to contaminants, and energetic costs associated with poor food availability and swimming in current." *Id.* Juveniles will be affected more than adults, and juvenile salmonids will be more vulnerable than the adults to high concentrations of PCBs. *Id.*

After considering the probable concentrations of contaminants and exposures to the listed species, NMFS concluded as follows:

> Since the proposed action will cause short-term (weeks) increases in contaminants in the water column and medium-term (months) increases in contaminants in the post-dredge surface until new, cleaner sediment accumulates, exposure to contaminants as a consequence of the proposed action is unlikely to result in lethality on a measurable scale, but may result in behavioral changes (*e.g.*, avoidance, altered feeding, delayed migration), physiological stress, and reduced fitness of juvenile ESA-listed salmonids that will likely lead to injury in some cases.

BiOp at 17–18. NMFS further found that "[o]ver the long term (years), the proposed action will maintain existing water quality and habitat conditions at Post office Bar." BiOp at 18. In addition, "[e]ven among juveniles, only a small portion of the individuals are likely to be killed or injured by effects of the dredging. Therefore, too few fish will be affected to produce a measureable [sic] effect on abundance, productivity, distribution, or genetic diversity of any of the affected populations." BiOp at 18–19.

Regarding the effects on critical habitat, NMFS found the proposed action likely would "cause minor, localized and temporary (weeks to months) degradation of critical habitat PCEs for water and sediment quality, forage, and free passage. None of these adverse effects are likely to be significant at the scale of the river reach or watershed." BiOp at 19.

NMFS concluded that the proposed action would not likely jeopardize the continued existence of the ESUs, nor would it "result in the destruction or adverse modification of designated critical habitats for these salmonids." BiOp at 20. NMFS indicated the Willamette River likely will continue to be used as a major shipping lane "for decades," during which the "current degraded value of critical habitat" will continue unabated. "The negative effects of the action will be brief or an extension of the existing conditions, and will not contribute to a reduction in the conservation value of designated critical habitat for the ESA-listed species." BiOp at 20–21.

## V. THE INCIDENTAL TAKE STATEMENT

In the ITS, NMFS first set forth the likely consequences of the dredging operation on the listed species:

Activities necessary to complete the proposed maintenance dredging at Post Office Bar will take place within the active channel of the Willamette River when individuals of chinook salmon, coho salmon, and steelhead considered in [the BiOp] are likely to be present. Adverse effects of the proposed action will include the temporary loss of prey items for rearing juveniles, and an increase in turbidity, sediment, and pollutants such as DDT, PCBs, and metals. The habitat that will be adversely affected by the proposed action is of moderate to poor quality and not limited at the site-specific or watershed scale. Nonetheless, these effects are reasonably likely to result in injuries and deaths of some juveniles of all species covered in [the BiOp] (except Columbia River chum salmon) within the action area.

BiOp at 22. NMFS indicated it is unable to predict precisely the numbers of "fish that are reasonably certain to be injured or killed if their habitat is modified or degraded by the proposed action." *Id.* It opined that the "best available indicators for the extent of take are duration of the proposed dredging and the extent of suspended sediment plumes." *Id.* If the thresholds for either of those indicators are exceeded for extent of take, that would trigger a re-initiation of consultation before further action is taken. *Id.*

NMFS listed two "reasonable and prudent measures" it found "necessary and appropriate to minimize the impact of incidental take of ESA-listed species from the proposed action," *id.,* to-wit:

The Corps shall:

1. Minimize incidental take from dredging by applying conditions to the proposed action that avoid or minimize adverse effects to water quality and benthic invertebrate organisms.

2. Ensure completion of a monitoring and reporting program to confirm this incidental take statement is

meeting its objective of minimizing incidental take from the proposed action.

BiOp at 23.

In order to "implement reasonable and prudent measure # 1," NMFS set out an extensive list of non-discretionary measures that must be undertaken by the Corps. *See* BiOp at 23–26. These measures include, *inter alia,* limiting dredging to the "summer in-water work window (July 1 through October 31)"; collecting and analyzing benthic samples; confining "dredging impacts to the minimum area and duration necessary to complete the project"; beginning the dredging in the areas of highest contamination first; ensuring that "all digging passes of the bucket will be completed without any material intentionally being returned to the wetted area," and without dumping of dredged material back into the project area; not over-filling the bucket; closing the bucket slowly on the bottom, and pausing before hoisting the bucket to allow any overage to settle; monitoring turbidity; ceasing dredging operations if the weather conditions will not allow monitoring; keeping daily logs of turbidity monitoring; implementing a pollution control plan to prevent pollutants caused by the dredging from entering the river; monitoring the depth of new sediment accumulation and new surface sediment quality; and deploying "an absorptive boom during dredging to capture contaminants that may be floating on the water surface as a consequence of dredging." *Id.* In addition, should any future maintenance dredging take place, the Corps must ensure that "at least 1 foot of new sediment accumulated after this current dredging operation must be left in place so the dredged surface or sand cap is not re-exposed in the future." BiOp at 26.

To implement reasonable and prudent measure # 2, the ITS directs the Corps to report all monitoring items to NMFS within specified time limits, and immediately report to NMFS "[a]ny exceedance of take covered by [the ITS]." *Id.* The Corps also must report immediately any sick, injured, or dead fish that are found in the project area, and take remedial action "[i]f the proposed action may worsen the fish's condition before NMFS can be contacted," such as moving the fish to reduce its stress as much as possible. *Id.*

## VI. PRELIMINARY INJUNCTION STANDARDS

Having now fully examined the nature of the proposed dredging action, the historical background, and the BiOp and ITS at issue, the court turns to consideration of the plaintiffs' motion for preliminary injunction. Ordinarily, to prevail on a motion for preliminary injunction, a party must show (1) either a likelihood of success on the merits of the case, or the existence of "serious questions going to the merits," *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134–35 (9th Cir. 2011); (2) a likelihood that the party will suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities (or "hardships") tips in the party's favor, *see id.;* and (4) that issuance of a preliminary injunction is in the public interest. *Sierra Forest Legacy v. Rey,* 577 F.3d 1015, 1021 (9th Cir.2009) (citing *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 19–20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008)); *see Cottrell,* 632 F.3d at 1134 (noting the " 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter* ").

However, the Ninth Circuit has articulated a standard for preliminary injunctive relief in ESA cases "that arguably completely precludes the balancing of relative harms." *Pacific Coast Fed. of Fishermen's Ass'ns v. Gutierrez,* 606 F.Supp.2d 1195, 1204 n. 6 (E.D.Cal.2008) (noting

"[d]istrict courts in other circuits have, in an abundance of caution, applied the traditional approach to injunctive relief, while at the same time recognizing the balancing of the equities and the determination of the public interest already performed by Congress") (citations omitted). Thus, in the Ninth Circuit:

> The traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA. *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510 (9th Cir.1994). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* at 1511 (citing *Friends of the Earth v. United States Navy*, 841 F.2d 927, 933 (9th Cir.1988)). As the Supreme Court has noted, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Accordingly, courts "may not use equity's scales to strike a different balance." *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir.1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species.").

*National Wildlife Fed. v. NMFS*, 422 F.3d 782, 793–94 (9th Cir.2005) (quoted with approval in *Pacific Coast Fed.*, 606 F.Supp.2d at 1204, cataloguing cases in accord). In light of this determination, the *National Wildlife Federation* court rejected the appellants' argument that the district court had erred as a matter of law in

failing to conduct a traditional preliminary injunction analysis. The court noted, "As the Supreme Court has instructed, such an analysis does not apply to ESA cases because Congress has already struck the balance." *Id.*, 422 F.3d at 794 (citation omitted).

The court, therefore, must consider, first, whether the plaintiffs have met their burden to show either a likelihood of success on the merits, or alternatively, the existence of "substantial questions" regarding the merits. Second, the court must consider whether the plaintiffs have shown a likelihood of irreparable harm if the injunction is not issued.

## VII. LIKELIHOOD OF SUCCESS/SUBSTANTIAL QUESTIONS

In considering the plaintiffs' likelihood of success on the merits, the court first must examine the plaintiffs' claims in this case, and the defendants' and intervenor's responses. In a nutshell, the plaintiffs do not seek to prevent the dredging action in the Post Office Bar completely; rather, they argue NMFS and the Corps have failed to comply with their statutory and regulatory obligations in connection with the proposed project, and they seek to halt the proposed action until the defendants have consulted as required and have considered the continuum of adverse impacts on the listed species over time.

### A. The plaintiffs' arguments

The plaintiffs argue NMFS and the Corps failed to use "the best scientific and commercial data available," as required by section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14(d). They note that the regulations require the defendants to evaluate both "the current status of the listed species or critical habitat," and "the effects of the action [8] and

---

**8.** Effects of the action refers to the direct and indirect effects of an action on the species or

critical habitat, together with the effects of

cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(2) & (3). They assert that the regulations "define the latter to include a 'snapshot' of the species' and critical habitat's health in light of all actions that have previously taken place in the action area." Dkt. # 6, p. 16 (citation omitted)

The plaintiffs rely on *Defenders of Wildlife v. Babbitt,*[9] 130 F.Supp.2d 121 (D.D.C. 2001), for the proposition that NMFS's practice of viewing each federal action and incidental take in isolation from other impacts on the listed species is unlawful. *Defenders of Wildlife* concerned BiOps prepared by the Fish and Wildlife Service ("FWS") relating to the survival of Sonoran pronghorn. The plaintiffs in *Defenders of Wildlife* argued, among other things, that the BiOp and Biological Assessments prepared by the defendants pursuant to EPA section 7's consultation requirements were "deficient because they fail[ed] to analyze the cumulative impacts or effects of other federal agency activities on the survival of the Sonoran pronghorn[.]" *Id.,* 130 F.Supp.2d at 122. The court first discussed the standard of review of the agencies' actions, noting:

In reviewing the action of the agencies, the Court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), to determine whether the agencies have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action...." *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "In thoroughly reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995) [citation omitted].

*Defenders of Wildlife,* 130 F.Supp.2d at 124. The court then examined the statutory framework, and determined that FWS had failed to comply with section 7(a)(2) of the EPA, which requires the agency to insure that its actions are "not likely to jeopardize the continued existence of" the listed species at issue. *Id.,* 130 F.Supp.2d at 125 (citing 16 U.S.C. § 1536(a)(2)).

The court held that FWS was required to "analyze the effects of the action in conjunction with the effects of other agencies' actions on the pronghorn" something it had failed to do in its BiOp. *Id.,* 130 F.Supp.2d at 126. More specifically, the

---

other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. **The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area,** the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated ac-

tions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

50 C.F.R. § 402.02 (emphasis added).

9. The plaintiffs mistakenly cite this case as *Fund for Animals v. Babbitt. See* Dkt. # 6, pp. 16–17. The *Defenders of Wildlife* court cites a case entitled *Fund for Animals v. Babbitt,* 903 F.Supp. 96 (D.D.C.1995), but it is the *Defenders of Wildlife* case that is on point here.

court held "[t]he impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by FWS.... The [BiOp] must also include an analysis of the effects of the action on the species when 'added to' the environmental baseline—in other words, an analysis of the *total* impact on the species." *Id.*, 130 F.Supp.2d at 127–28 (quoting 50 C.F.R. § 402.02) (emphasis in original). The court did not limit its holding to the "action area" of the project in question, finding that the agency could not define the action area narrowly "to exclude federal activities that are impacting the pronghorn." *Id.*, 130 F.Supp.2d at 126. The court effectively required FWS to consider the cumulative impact on the pronghorn species-wide. *See id.*

The plaintiffs argue that nearly all of the over 150 BiOps issued by NMFS since 2005 "for projects with adverse impacts on listed Willamette ESUs have included ITSs authorizing some level of incidental take of these fish," yet NMFS has failed to keep track of the cumulative incidental take over time. Dkt. # 6, p. 17. Nevertheless, NMFS continues to issue additional authorizations for incidental take of "species which NMFS expressly acknowledges are near extinction." Dkt. # 6, pp. 17–18.

The plaintiffs argue the BiOp itself is "the best evidence" that NMFS has failed to consider the impact of other federal actions on the listed ESUs and critical habitat. "For example, NMFS cites to a 2007 study finding that lower Columbia River chinook were at 'high risk' as of that date, and concluding that '[f]urther habitat changes in the Willamette River mainstem and estuary would have a significant effect on fall Chinook salmon.' " Dkt. # 6, pp. 16–17 (citing BiOp at 6). The plaintiffs assert that information is readily available

to NMFS about take it has authorized previously "by simply examining its prior incidental take statements, yet NMFS did not consider this information prior to issuing the incidental take statement as part of the Post Office Bar BiOp." Dkt. # 6, p. 18. The plaintiffs claim NMFS continues to cite the same information repeatedly in its BiOps and ITSs regarding the current status of the ESUs and their habitat, despite the fact that NMFS "repeatedly authorizes additional adverse impacts and additional take[.]" *Id.*

The plaintiffs further argue NMFS failed to take into account its own 2008 Jeopardy BiOp, including consideration of whether the Corps is implementing the RPA and, if so, the effectiveness of those measures. Dkt. # 6, pp. 19–20. Again, the plaintiffs argue, this information should be "readily available to NMFS given that the agency is part of every work group and decision-making body for implementing the RPA." Dkt. # 6, p. 20.

The plaintiffs conclude that NMFS has ready access to information that is relevant and vital to its jeopardy assessment in connection with the proposed dredging project. The plaintiffs assert that information included in NMFS's prior BiOps and ITSs, "as well as monitoring data relevant to measures set forth in the Willamette Project RPA, constitutes the 'best science' regarding the status of ESUs and their critical habitat affected by the Post Office Bar project." Dkt. # 6, p. 21. The plaintiffs argue NMFS's failure to consider this available information in formulating the BiOp violated the agency's duty under section 7 of the ESA to use the "best available science." *Id.*

The plaintiffs further argue NMFS's conclusions regarding the likely effects of the proposed action are arbitrary and capricious. They assert that NMFS's failure to consider the impacts of past actions on

the ESUs and critical habitat is like a person continually withdrawing money from a bank account without checking the balance first, resulting in the clear possibility that eventually, the account will be overdrawn. The plaintiffs argue NMFS's continuing to authorize adverse impacts and take without assessing whether the 2008 RPA has been effective is arbitrary and capricious. Dkt. # 6, pp. 21–22.

The plaintiffs also argue NMFS has failed to consider the short-term adverse impacts to the listed ESUs. They rely on *Pacific Coast Federation of Fishermen's Associations, Inc. v. NMFS*, 265 F.3d 1028 (9th Cir.2001), where they state "the Ninth Circuit overturned a NMFS BiOp for failing to consider short-term adverse impacts to a salmon run despite acknowledging that 'even a low level of additional impact to any life form, especially the anadromous form which is at critically low levels, may reduce the likelihood of survival and recovery of the ESU as a whole.' " Dkt. # 6, p. 22 (quoting *Pacific Coast*, 265 F.3d at 1037–38). The plaintiffs argue the same conditions are present in the present case as those the *Pacific Coast* court considered. They argue that although the 2008 Jeopardy BiOp set forth short-term measures intended to prevent extinction of Lower Columbia Chinook, NMFS arbitrarily ignored "short-term impacts to this and other ESUs by reasoning that, despite short-term harms due to the proposed dredging, their habitat will not be any worse than normal over the long term." Dkt. # 6, pp. 22–23.

Contending NMFS failed to consider important aspects of the potential impacts of the Post Office Bar project, the plaintiffs argue the BiOp is arbitrary and capricious. *Id.*, pp. 23–24 (quoting *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1147 (W.D.Wash.2000)) ("A biological opinion is arbitrary and capricious and will be set aside when it has failed to articulate a satisfactory explanation for its conclusions or when it has entirely failed to consider an important aspect of the problem.").

The plaintiffs also argue the Corps failed to meet its "free-standing obligation to ensure that its actions are not likely to jeopardize affected ESUs or destroy or adversely modify their critical habitat." Dkt. # 6, p. 24 (citing *Resources Limited v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993)). The plaintiffs contend the information on past federal actions in the area is equally available to the Corps as it is to NMFS, and the Corps failed to consider the applicable information and arrived at an arbitrary conclusion. *Id.*

The plaintiffs also argue the ITS is unlawful because the surrogates employed by NMFS are " 'coextensive with the project's own scope' and both 'define[ ] and limit[ ] the level of take using the parameters of the project,' " a practice the plaintiffs state was deemed unlawful in *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1039 (9th Cir.2007) ("*ONRC* "). Dkt. # 6, p. 25 (quoting *ONRC v. Allen*, *supra* ). The plaintiffs argue

> NMFS'[s] use of surrogates for defining allowable incidental take without linking those surrogates in a meaningful way to actual take is much like tracking one's bank account withdrawals by taking notes such as "today I took some money out of my account," and "yesterday I withdrew a bit from my account." Such notations are just as meaningless for tracking total withdrawals of money from a bank account as "dredging for one month causing 5 NTUs over background turbidity" is for keeping track of the number of total salmon and steelhead injured or killed.

Dkt. # 6, p. 26.

The plaintiffs also note that in some ITSs issued by NMFS, the agency *did* provide actual numeric estimates of the

number of ESUs likely to be killed or injured by a proposed project, yet NMFS did not even consider those numbers in the BiOp and ITS prior to authorizing additional incidental take. The plaintiffs assert this failure "demonstrates NMFS'[s] complete lack of effort to track total take of listed ESUs over time, no matter how it is quantified or estimated." *Id.* The plaintiffs conclude that this failure renders the 2010 BiOp arbitrary. *Id.*, pp. 26–27.

## B. The defendants' arguments

The defendants argue NMFS did, in fact, use the "best available scientific data" in its assessment of the current status of the affected salmonids and critical habitat. Addressing the plaintiffs' argument that NMFS uses the same language repeatedly in the environmental baseline section of its BiOps relating to the current status of the listed species and critical habitat, the defendants point to the Consultation Handbook's "guidance on the type of information used to prepare this section of a biological opinion." Dkt. # 19, p. 11. The Consultation Handbook indicates the BiOp should include information on the life history, habitat, and distribution of the species, " 'and other data on factors necessary to its survival . . . to provide background for analyses in later sections. This analysis documents the effects of all past human and natural activities or events that have led to the current status of the species.' " *Id.* (quoting Consultation Handbook at 4–19) The Consultation Handbook expressly provides, " 'Once this section is developed for a given species, it can be used in successive biological opinions. Modification is necessary only when new information is developed.' " *Id.* (quoting Consultation Handbook at 4–20).

The defendants note that NMFS uses the four VSP criteria (abundance, productivity, spatial structure, and genetic diversity) as "a recognized 'framework for identifying the biological requirements of listed salmonids, assessing the effects of management and conservation actions, and ensuring that such actions provide for the survival and recovery of listed species.' " *Id.* (quoting 50 C.F.R. § 223.203(b)(4)(i)(B)). They assert that use of the VSP criteria for this purpose has been upheld by the courts repeatedly. Dkt. # 19, p. 12 (citing *Trout Unlimited v. Lohn,* 559 F.3d 946, 958 (9th Cir.2009); *Northwest Environ. Def. Ctr. v. NMFS,* 647 F.Supp.2d 1221, 1238 (D.Or.2009) (Mosman, J.) ("*NEDC*"); & *Consolidated Salmonid Cases,* 713 F.Supp.2d 1116, 1163–64 (E.D.Cal.2010)).

The defendants note that the McElhany 2007 report, and a June 2005 Technical Memorandum, both used the VSP criteria to complete "comprehensive assessments of the status of the salmon and steelhead at issue in this case." *Id.* McElhany 2007 assigned a 100–year extinction risk to each of the listed species, estimating the extinction risk for Lower Columbia River and Upper Willamette River Chinook, and Lower Columbia River coho salmon, as "high"; and the extinction risk for Lower Columbia River and Upper Willamette River steelhead as "moderate." According to the defendants, McElhany 2007 makes it clear that the short life span of the salmonids requires data to be averaged over a period of time, and assessing the risk of extinction involves a level of professional judgment that takes into account information not readily quantifiable. In other words, the defendants argue quantification of the numbers of salmon affected by each separate incidental take statement would be unrealistic as well as inaccurate. *See id.*, pp. 13–14.

The defendants further assert that NMFS is not obligated to conduct new studies and come up with new information; rather, the 'best available data' requirement " 'merely prohibits [NMFS] from dis-

regarding available scientific evidence that is in some way better than the evidence [NMFS] relies on.'" *Id.*, p. 14 (quoting *Kern County Farm Bur. v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir.2006)) (internal quotation marks, additional citation omitted). They claim the plaintiffs' argument that the defendants failed to use the best available data "will be rejected where the plaintiff fails to 'cite[ ] any scientific studies that indicate the [agency]'s analysis is outdated or flawed.'" *Id.* (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir.2009)). The defendants argue the plaintiffs have not cited any scientific data or studies that supposedly would be better than the analyses upon which NMFS relied, and "Plaintiffs' attempt to overturn the agency's expert opinion based on little more than unsupported armchair science should be rejected." *Id.*

The defendants further observe that not all of the BiOps issued between the McElhany 2007 report and the May 2010 BiOp documented only adverse impacts. They cite several instances where BiOps actually found the agency actions under consultation would benefit the affected species significantly. They also argue that some of the authorized actions, whether their impacts were found to be adverse or beneficial, resulted in no effect at all on any of the factors limiting species recovery overall (i.e., "no effect on the VSP"). Dkt. # 19, p. 15 (citing *NEDC*, 647 F.Supp.2d at 1238).

The defendants note that section 4 of the ESA requires NMFS "to conduct a new status review of each listed species 'at least once every five years,' ... and, in fact, new status reviews for the species at issue are underway." Dkt. # 19, p. 16 (quoting 16 U.S.C. § 1533(c)(2); citing 75 Fed.Reg. 13,082 (Mar. 18, 2010)). They further note the Consultation Handbook only requires that a BiOp include a summary of the status of the species as background information, rather than requiring a discussion of "every impact discussed in every prior biological opinion." *Id.* (citing Consultation Handbook at 4–19).

The defendants further claim the plaintiffs have misstated the findings of the 2008 Jeopardy BiOp (referred to by the defendants as the "Willamette Project BiOp"). The defendants state NMFS evaluated that proposed project's impacts in the Upper Willamette basin over a fifteen-year period, and once NMFS concluded the proposed action "would be insufficient to avoid jeopardizing the continued existence" of Upper Willamette River Chinook and steelhead, NMFS then developed reasonable and prudent alternatives "calling for the implementation of significant changes to the dams and other facilities, including major construction projects to provide fish passage, most of which are scheduled to be completed between 2015 and 2024." Dkt. # 19, p. 17 (citation omitted). In addition, the defendants state NMFS found the RPA would benefit the affected species substantially. The defendants further assert that "contrary to Plaintiffs' insinuations, the Corps and the other action agencies are actively implementing the RPA." *Id.* (citing Dkt. # 20, Decl. of Mindy Simmons, ¶¶ 4–8; Dkt. # 21, Decl. of Kevin McArdle, Ex. 3).

The defendants also assert the 2008 RPA did not mandate that NMFS collect monitoring information to demonstrate that the short-term measures were yielding overall improvement in the status of the species. They note, "NMFS found that it would take years for the RPA to yield a measurable improvement in the overall status of the affected species[.]" Dkt. # 19, p. 18. Thus, the defendants argue, "the *absence* of data as of May 2010 indicating whether RPA implementation had yielded a change in the overall status of UWR Chinook in no way indicates

NMFS's assessment of the status of the species is at odds with the best data *available*. Plaintiffs' 'attempt to equate an absence of data with a failure to analyze does not succeed.'" *Id.* (quoting *Oceana, Inc. v. Evans*, 384 F.Supp.2d 203, 231 (D.D.C. 2005); citing *Hammond v. Norton*, 370 F.Supp.2d 226, 264 (D.D.C.2005)). Essentially, the defendants argue NMFS cannot analyze nonexistent data.

The defendants further contend that the plaintiffs are proposing NMFS "institute a new system for conducting jeopardy analyses that is akin to balancing a checkbook." Dkt. # 19, p. 19. The defendants argue this proposed methodology is unsupported by any scientific data, and is foreclosed by NMFS's valid use of surrogates to estimate incidental take. They rely on the court's analysis in the *Consolidated Salmonid Cases*, 713 F.Supp.2d 1116 (E.D.Cal.2010), where the court held, "A decision about jeopardy must be made based on the best science available at the time of the decision; the agency cannot wait for or promise future studies." *Id.*, 713 F.Supp.2d at 1158. The plaintiffs in the *Consolidated Salmonid Cases* argued NMFS "failed to apply the VSP methodology in a sufficiently rigorous manner." *Id.*, 713 F.Supp.2d at 1163. The court found the plaintiffs' argument unpersuasive, holding as follows:

> The BiOp did not ignore the VSP methodology. Rather, it chose to use VSP in a qualitative manner as a conceptual framework, as recommended by Lindley (2006). Although the analysis in the BiOp may have benefited [sic] from the application of quantitative VSP methodologies, it is disputed whether the failure to do so represents a breach of accepted scientific practice. A court must defer to the agency in such scientific disputes.
>
> The agency is not required to generate new studies. For example, in *Southwest Center for Biological Diversity v. Babbitt*, 215 F.3d 58, 60–61 (D.C.Cir.

2000), the district court found the available evidence regarding FWS's decision not to list the Queen Charlotte goshawks "inconclusive" and held that the agency was obligated to find better data on the species' abundance. The D.C. Circuit reversed, emphasizing that, although "the district court's view has a superficial appeal ... this superficial appeal cannot circumvent the statute's clear wording: The secretary must make his decision as to whether to list a species as threatened or endangered 'solely on the basis of the best scientific and commercial data available to him....' 16 U.S.C. § 1533(b)(1)(A)." *Id.* at 61. Requiring NMFS to adapt the VSP methodology to operate as a quantitative model would be the equivalent of requiring NMFS to generate data. The court has no authority to do so.

*Id.*, 713 F.Supp.2d at 1163–64.

The defendants argue the plaintiffs have failed to cite any scientific studies or methodology available to NMFS at the time it issued the BiOp that demonstrated "NMFS could have 'tracked' the various impacts discussed in prior biological opinions in a biologically meaningful manner that would have allowed the agency to conduct an alternative jeopardy analysis for the dredging project at issue." Dkt. # 19, p. 20. They further assert that the "myriad impacts on salmonids often cannot be expressed in terms of a specific number of affected fish that could be easily 'tracked.'" *Id.* It is for this reason that NMFS uses surrogates to "perform the function of a numeric estimate by providing a 'trigger' for reinitiation of consultation, and NMFS 'articulate[s] a rational connection between the surrogate and the taking of the species.'" Dkt. # 19, pp. 20–21 (quoting *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir.2010)).

The defendants also argue that NMFS's choice of methodology for assessing jeopardy " 'is owed substantial deference' " under the law. Dkt. # 19, p. 22 (quoting *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1066, 1067 (9th Cir.2004)). In *Gifford*, the court held that "[f]ocus on actual species count is an overly narrow interpretation of what is required under the jeopardy prong." *Id.*, 378 F.3d at 1067. The defendants assert that regardless of the plaintiffs' preference, "courts are not free to 'impose procedural requirements that are [not] explicitly enumerated in the pertinent statutes." Dkt. # 19, p. 22 (quoting *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir.2008) (noting the court is "to conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.' ")) (citations omitted).

The defendants disagree with the plaintiffs' contention that the ESA mandates their proposed approach, and they assert the *Oceana* case cited by the plaintiffs actually supports NMFS's position. Dkt. # 19, pp. 22–23. Clarifying *Defenders of Wildlife*, the case upon which the plaintiffs rely, the *Oceana* court held that *Defenders of Wildlife* " 'was not . . . imposing a requirement that each [BiOp] include a collective jeopardy finding, *i.e.*, a determination whether all federal agency action, considered together, is likely to jeopardize the continued existence of [the species].' " Dkt. # 19, p. 23 (quoting *Oceana*, 384 F.Supp.2d at 230) (internal quotation marks, citation omitted). The defendants instead rely on an unreported case from the Western District of Washington that was affirmed on appeal; i.e., *Northwest Environmental Advocates v. NMFS*, No. C04–0666RSM, 2005 WL 1427696, at *11 (W.D.Wash. June 15, 2005), *aff'd*, 460 F.3d 1125 (9th Cir.2006). In that case, the court rejected the plaintiff's argument that

NMFS had failed to identify or analyze the environmental baseline adequately because NMFS did not "articulate 'the degree to which the estuary's current degraded conditions, when measured against the species' status, leave any 'room' to accommodate additional adverse impacts without causing jeopardy.' " *Id.* The court held the plaintiff's argument was "misguided because nothing in the statute, regulations, or guidance requires such an express articulation." *Id.*

The defendants also reject the plaintiffs' contention that NMFS ignored short-term adverse impacts of the proposed action on the listed species, or that "NMFS failed to consider whether the project's impact on the factors limiting species recovery 'is likely to prevent or appreciably delay recovery of these ESUs.' " Dkt. # 19, p. 24 (quoting Pl's brief, Dkt. # 6, at 23). The defendants note the ESA only precludes federal actions that will "jeopardize the continued existence of" a threatened or endangered species, meaning the project " 'reasonably would be expected, directly or indirectly, to *reduce appreciably* the likelihood of both the survival and recovery of a listed species in the wild.' " Dkt. # 19, pp. 24–25 (quoting 50 C.F.R. § 402.02 (emphasis added)). They note the preamble to the joint consultation regulations observes that " '[a]dverse effects may exist without constituting jeopardy,' . . . and 'adverse effects not rising to the level of jeopardizing the continued existence' of a listed species cannot be the basis for issuing a jeopardy opinion." Dkt. # 19, p. 25 (quoting 51 Fed.Reg. at 19,950, 19,934–35; citing *Center for Marine Conserv. v. Brown*, 917 F.Supp. 1128, 1147 (S.D.Tex.1996); *Forest Guardians v. Veneman*, 392 F.Supp.2d 1082, 1092 (D.Ariz. 2005) ("adverse effects were not inconsistent with 'no jeopardy' conclusion")).

The defendants argue the plaintiffs have not cited any of the project's potential effects that NMFS allegedly ignored, and they maintain NMFS conducted a thorough evaluation of all of the project's potential effects, both short-term and long-term, in formulating the BiOp. *Id.* The defendants argue NMFS did everything it was required to do, including articulating a rational connection with the facts found and the choices made, and "[n]othing more is required under the deferential APA standard of review." Dkt. # 19, p. 26 (citing *Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir.2007)).

Turning to the lawfulness of the ITS, the defendants argue NMFS's use of surrogates met all three of the requirements for the use of surrogates to estimate the amount or extent of incidental take. They assert that the use of surrogates is proper "if: (1) a numerical take estimate cannot practicably be obtained; (2) the surrogates perform the function of a numerical estimate by providing an adequate trigger for reinitiating consultation; and (3) NMFS 'articulate[s] a rational connection between the surrogate and the taking of the species.'" Dkt. # 19, pp. 26–27 (quoting *Wild Fish Conservancy*, 628 F.3d at 531). They argue NMFS explained why it could not determine a numerical estimate of take; it "articulated a rational connection between the surrogates and the anticipated take"; and the surrogates used "provide clear triggers for reinitiating consultation." Dkt. # 19, p. 27. They conclude that "[w]hile the surrogate triggers reflect the *anticipated impacts* of the project, this fact alone 'should not render them defective.'" Dkt. # 19, p. 28 (quoting *NEDC*, 647 F.Supp.2d at 1239).

The defendants further assert that the Corps' reliance on the BiOp was rational; indeed, the Corps "conducted its own assessment and rationally concluded that the project would have no significant impact on listed species." Dkt. # 19, p. 28.

For all these reasons, the defendants argue that the plaintiffs have failed to show they are likely to succeed on the merits in this case, or to raise "serious questions" going to the merits. *Id.*

## C. The Intervenor's arguments

As expected, the intervenor's arguments are substantially similar to the defendants', and the court will not duplicate discussion of the same arguments raised by the defendants. The intervenor does, however, raise some additional points.

First, the intervenor notes that the plaintiffs' argument in favor of a "running tally" of incidental take already has been flatly rejected by this court in *NEDC*. The plaintiffs in *NEDC* also used the "bank account" analogy, and argued NMFS had failed to take action to determine the "'current balance' of the take bank account, or whether a new project would 'overdraw the account.'" Dkt. # 14, pp. 16–17 (quoting *NEDC*, 647 F.Supp.2d at 1237). The *NEDC* court held:

"[T]he ESA does not prescribe how the jeopardy prong is to be determined." *Gifford Pinchot*, 378 F.3d at 1067. NMFS acted reasonably in this case. Current levels of take cannot be categorized numerically and the VSP are an appropriate scientifically based proxy. Based on the abundant information in the BiOp about the current state of each of the listed species and the state of the critical habitat, NMFS knows "roughly at what point survival and recovery will be placed at risk." *Nat'l Wildlife Fed'n*, 524 F.3d at 936. Thus, NMFS's determination of no jeopardy was not arbitrary and capricious due to a failure to account for the current level of take in the Willamette.

*NEDC*, 647 F.Supp.2d at 1238. The intervenor argues the plaintiffs' position in the

present case fails for the same reasons articulated by the *NEDC* court. Dkt. # 14, p. 17.

The intervenor further argues the plaintiff's "running tally argument ... fundamentally makes no sense" because it "is premised on two misconceptions: (1) one 'take' equals one dead or seriously injured fish; and (2) only a finite amount of take is available." Dkt. # 14, p. 19. The intervenor asserts neither of these conceptions is accurate, pointing to the definition of "take" in the regulation, 16 U.S.C. § 1532(19). *Id.* (noting that "Take" under the ESA does not equal "mortality."); *see* p. 1021, *supra.* Thus, the intervenor asserts, "Take could be as severe as death, as minor as a momentary harassment, or as ephemeral as an 'attempt to engage in any such conduct.'" Dkt. # 14, p. 19 (quoting 16 U.S.C. § 1532(19)).

The intervenor argues the plaintiffs' reliance on *Defenders of Wildlife* is inapposite. According to the intervenor, the same court later clarified that it had never held a BiOp must add all prior takes, and "a biological opinion could be legally valid 'even though it does not numerically add the takes from different sources together.'" Dkt. # 14, p. 20 (quoting *Oceana,* 384 F.Supp.2d at 230).[10] The intervenor argues the plaintiffs are attempting to require NMFS to use an "actual species count," a requirement that has been rejected by the Ninth Circuit. Dkt. # 14, pp. 20–21 (citing *Gifford Pinchot,* 378 F.3d at 1067). The intervenor claims the plaintiffs' methodology argument fails in light of NMFS's use of VSP methodology to evaluate jeopardy. Dkt. # 14, p. 23.

Regarding the ITS, the intervenor argues NMFS's use of surrogates to establish triggers to the reinitiation of consultation was both proper and sanctioned by the courts. The intervenor notes a surrogate "must contain 'measurable guidelines' and 'must not be so general that the applicant or the action agency cannot gauge its level of compliance.'" Dkt. # 14, p. 26 (quoting *ONRC,* 476 F.3d at 1038). The intervenor argues the ITS in this case meets those requirements by NMFS's selection of two surrogate triggers, either of which, if exceeded, will require reinitiation of consultation. "The first trigger is the one-month duration of the project; if the project lasts longer than one month, then the suspended sediments will increase beyond those anticipated, and reinitiation is necessary. [BiOp at 22.] The second trigger is a turbidity level of 5 NTU over background as measured 500 feet from the dredging area; if that level is exceeded, then the project is having a greater impact than anticipated, and a reinitiation is therefore necessary." Dkt. # 14, pp. 26–27.

The intervenor rejects the plaintiffs' argument that these surrogates are "coextensive with the project's own scope," as was the case in *ONRC. See ONRC,* 476 F.3d at 1039; Dkt. # 14, p. 27. Instead, the intervenor notes the scope of the proposed dredging project is removal of "45,000 cubic yards from the Willamette River to restore the channel's 40–foot navigation depth at RM 2.1–2.4, which is 30,000 cubic yards less than the scope and impact analyzed in the Post office Bar BiOp."[11] Dkt.

---

**10.** I discuss the *Oceana* case in more detail in section VII.E., *infra.*

**11.** The project's scope initially was to remove 75,000 cubic yards of sediment from the river. One of the surrogates utilized by NMFS to define the amount or extent of incidental take is limiting the time frame of the project to

thirty days; if the project exceeds thirty days, that will trigger reinitiation of consultation. At oral argument, the intervenor stated its understanding that the Corps has decided to limit dredging to thirty days, during which only about 45,000 cubic feet will be able to be removed.

# 14, p. 27 (citation omitted). According to the intervenor, the two surrogate factors "are not the 'scope' of the project[,] but rather are mitigation and monitoring measures designed to limit the amount of take," *id.*, and if they are exceeded, then the ITS requires reinitiation of consultation. *Id.*, pp. 26–27. That is to say, for example, that the scope of the project was not to generate turbidity of 5 NTU over background. The intervenor further notes that the *NEDC* court distinguished *ONRC* and rejected almost identical arguments offered by the plaintiffs in that case. *Id.*, p. 28.

## D. The plaintiffs' reply

The plaintiffs first assert they are not attempting to change the way NMFS implements the ESA, as argued by the defendants and the intervenor, nor are they seeking to impose "a new and novel methodology" upon the agency. Dkt. # 23, p. 1. The plaintiffs state they do not "take issue with NMFS'[s] scientific judgment; rather, Plaintiffs maintain that NMFS did not follow the law and the agency's own policies in preparing the Post Office Bar BiOp." *Id.*, p. 2. The plaintiffs state their analogy of a bank account that becomes overdrawn, or the final straw that breaks a camel's back, simply illustrated the type of analysis required by ESA section 7 and its accompanying regulations and policies.

The plaintiffs acknowledge that incremental adverse impacts on listed species or designated critical habitat are allowed under section 7, but they argue such impacts are allowed only until "the total impacts reach a point where a proposal for yet more impacts must be halted because 'the action effects, when added to the underlying baseline conditions, would tip the species into jeopardy [or adverse modification of critical habitat].'" Dkt. # 23, p. 3 (quoting *National Wildlife Fed. v. NMFS,* 524 F.3d 917, 929 (9th Cir.2008)). Thus, the plaintiffs argue, NMFS rationally cannot "assess whether or not a project with adverse effects to species and/or critical habitat can proceed" without first "knowing how close a species or its critical habitat is to the jeopardy/adverse modification lines[.]" Dkt. # 23, p. 4.

The plaintiffs point to NMFS's representation, in 2000, when the agency "adopted rules governing take of four of the five ESUs affected by the Post Office Bar project," that it " 'intend[ed] to work with co-managers to develop the necessary standards and assessment techniques' " and it was " 'moving toward implementing a method for assessing total take across broad sectors.' " Dkt. # 23, p. 6 (quoting 65 Fed.Reg. 42422–01, 42440 (2000)). The plaintiffs argue that NMFS and its co-managers have failed to develop these "standards and assessment techniques" despite the passage of more than a decade since NMFS made this representation.

The plaintiffs also argue the VSP criteria, standing alone, are inadequate to comply with the analyses required by section 7. The plaintiffs argue "[t]he concept of a 'viable population' focuses on the likelihood that a salmonid population will persist over 100 years, and does not attempt to set forth criteria to assess habitat condition or impacts." Dkt. # 23, p. 7 (citation omitted). The plaintiffs assert that although the VSP criteria are useful as "a generic framework . . . in assessing risk to salmon populations," even NMFS has noted that application of the VSP criteria " 'will require population- and ESU-specific evaluations. This will not be very satisfying to managers looking to VSP for "the answer," but is the only scientifically sound course at this time.' " Dkt. # 23, p. 8 (quoting 65 Fed.Reg. at 42430).

The plaintiffs further argue the McElhany 2007 report upon which the defendants rely supports the plaintiffs' position that " '[a] current status evaluation . . . is

concerned with providing an accurate view of where a population is at a given time and should utilize *all* available information.' " Dkt. # 23, p. 9 (quoting McElhany 2007 at 4) (emphasis in original). The plaintiffs maintain the Consultation Handbook similarly requires that a jeopardy analysis include an assessment of 'the aggregate effects of everything that has led to the species' current status and, for non-Federal activities, those things likely to affect the species in the future.' " *Id.* (quoting Consultation Handbook at 4–35).

The plaintiffs take issue with the defendants' representation that NMFS only needs to update information on the ESUs' current status when " 'new information is developed indicating that the status of the species has changed.' " Dkt. # 23, p. 10 (quoting Dkt. Dkt. # 19, p. 16). The plaintiffs assert that obviously, NMFS cannot "develop information indicating that species' status has changed if it has no intent or means of tracking incremental impacts to these species over time." *Id.*

The plaintiffs also claim the McElhany 2007 report was updated in 2009, to determine that the risk of extinction of upper Willamette River Chinook has degraded from "high" to "very high," and that of the UWR steelhead actually had improved from "moderate" to "low." The plaintiffs observe that NMFS was a part of the "recovery team" that issued a draft recovery plan for Willamette River ESUs in October 2010, which cited the 2009 update, but nevertheless, NMFS used the 2007 extinction risks in the 2010 BiOp instead of the updated risks, and continues to insert boilerplate language regarding the species' "current status." Dkt. # 23, p. 12.[12]

Further, the plaintiffs argue the "VSP criteria were designed solely to determine viability of salmonid populations, not to evaluate salmon habitat." *Id.* They argue NMFS "virtually ignor[ed] critical habitat" in their evaluation of the proposed dredging project. *Id.*, pp. 12–13. As with the jeopardy analysis of the species, the plaintiffs argue NMFS erred in failing to consider its previous BiOps detailing those projects' impacts on critical habitat. *Id.*, p. 13. The plaintiffs further reiterate their argument that NMFS failed to use the best science available by failing to consider all the available evidence relating to implementation and effectiveness of the RPA set forth in the 2008 Jeopardy BiOp. *Id.*, pp. 13–16.

Regarding the defendants' argument that NMFS did, in fact, consider the short-term impacts to the listed ESUs and their critical habitat, the plaintiffs observe that although the defendants and the intervenor "argue strenuously that NMFS evaluated the short term impacts to listed species and critical habitat and found them acceptable, they never point to actual language in the BiOp supporting this finding." *Id.*, p. 16 (citations omitted).

### E.   Discussion

■ The court first notes that the plaintiffs rely on *Defenders of Wildlife* for the proposition that a BiOp must include an analysis of previous agency actions on the endangered species. The defendants and intervenor argue *Oceana* effectively negated *Defenders of Wildlife* by "clarifying" that a BiOp can be legally valid "even though it does not numerically add the takes from different sources together." *Oceana*, 384 F.Supp.2d at 230. It is instructive to examine what the *Oceana* court held in more detail to place the parties' arguments in proper context.

---

12.   At oral argument, the Defendants stated there was no 2009 "update" to McElhany 2007. Rather, there was a proposed revision that appeared in the draft recovery plan. No such revision to the McElhany report has been adopted.

In *Defenders [of Wildlife],* the Court held that "[t]he impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by FWS.... The [BiOp] must also include an analysis of the effects of the action on the species when 'added to' the environmental baseline—in other words, an analysis of the *total* impact on the species." 130 F.Supp.2d at 127–28 (quoting 50 C.F.R. § 402.02) (emphasis in original). Because FWS had merely listed the other activities affecting the pronghorns without making them part of its analysis, the Court found the [BiOp] to be inadequate. When the agencies issued new [BiOps] on remand, the plaintiffs moved to enforce the Court's order, claiming that the [BiOps] were still inadequate. *Defenders of Wildlife v. Norton,* 2003 WL 24122459 (D.D.C. Jan. 7, 2003) (hereinafter *"Defenders II "*). In this second round, the Court clarified that a [BiOp] is adequate if it "takes the baseline seriously and makes a concerted effort to evaluate the impact of [the agency's] proposed action against that backdrop." *Id.* at *4. *"Defenders [of Wildlife] . . .* was not . . . imposing a requirement that each [BiOp] include a collective jeopardy finding, i.e., a determination whether *all* federal agency action, considered together, is likely to jeopardize the continued existence of [the species]." *Id.* at *5 (emphasis in original). The Court concluded that the [BiOp] issued on behalf of the BLM was sufficient because it set out the take anticipated for nine other agency actions, considered the potential effects of the proposed BLM action, and specifically acknowledged that the BLM's actions needed to be evaluated in the context of an environmental baseline showing that Sonoran pronghorns were in "immediate danger of extirpation." *Id.* at *4. *Oceana,* 384 F.Supp.2d at 230. Thus, although the *Oceana* court held a BiOp need not "numerically add the takes from different sources together," *id.,* it held an agency is required to evaluate a proposed action "in light of the environmental baseline," which, by definition, must include consideration of the effects of other agency actions and the current status of the ESUs at issue. *See id.;* 50 C.F.R. § 402.14(g)(3) (the agency must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat").

The defendants are correct that "[f]ocus on actual species count is an overly narrow interpretation of what is required under the jeopardy prong." *Gifford Pinchot,* 378 F.3d at 1067. Rather, a jeopardy analysis may be based on "a habitat proxy," *id.,* (*i.e.,* "predicting species jeopardy based on habitat degradation," *id.,* 378 F.3d at 1066); and ecological conditions may be used "as a surrogate for defining the amount or extent of incidental take . . . so long as these conditions are linked to the take of the protected species." *Arizona Cattle Growers' Ass'n,* 273 F.3d at 1250 (internal quotation marks omitted). Here, NMFS analyzed the status of the listed salmonids using the VSP criteria (i.e., abundance, productivity, spatial structure, and genetic diversity). This court has held previously that "the VSP are an appropriate scientifically based proxy." *NEDC,* 647 F.Supp.2d at 1238 (quoted in context *supra,* p. 1041).

The court rejects the plaintiffs' argument that the surrogates NMFS employed in this case are "coextensive with the project's own scope" because NMFS did not link the surrogates to actual numbers of incidental take. *See* Dkt. # 26, pp. 25–26. Use of a surrogate only comes into play

when the agency is *unable* to determine the actual numbers of take. Arguing a surrogate cannot be used unless it is linked to actual numbers of incidental take, when the only time surrogates are used is when actual numbers are unavailable, is circular reasoning.

The key to the plaintiffs' case is the statutory language itself. The applicable statute requires that after consultation,

> the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth [1] the Secretary's opinion, and [2] a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section and can be taken by the Federal agency or applicant in implementing the agency action.

16 U.S.C. § 1536(b)(3). Thus, the Secretary is charged with setting forth an opinion, and a summary of the information upon which the opinion is based. The law does not specify the particular methodology NMFS must use. Moreover, the plaintiffs have failed to cite a single scientific study NMFS failed to consider, or to provide a single expert opinion of their own concluding the proposed dredging action would jeopardize the ESUs or their critical habitat, either within the defined action area or on a broader scale.

The court recognizes that a different methodology is needed in order to allow NMFS and other federal agencies to provide more accurate opinions regarding the current status of threatened and endangered species and critical habitat. However, the court is not free to rewrite the statute to include additional requirements such as the development of new methodologies or new data. Further, the "agency's

scientific methodology is owed substantial deference[.]" *Gifford Pinchot,* 378 F.3d at 1066 (citing *United States v. Alpine Land & Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989)).

The court finds the plaintiffs have failed to meet their burden to show either a likelihood of success on the merits, or the existence of substantial questions going to the merits.

## VIII. IRREPARABLE HARM

■ In order to obtain a preliminary injunction, the plaintiffs also "must establish that irreparable harm is likely, not just possible." *Frankl v. HTH Corp.,* 650 F.3d 1334 (9th Cir.2011) (citing *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.2011)). There is "considerable overlap" between the "irreparable harm" prong of the preliminary injunction standard and the "likelihood of success on the merits" or "serious question" prong. *Earth Island Institute v. Carlton,* 626 F.3d 462, 474 (9th Cir.2010).

■ Thus, in Ninth Circuit ESA cases, the general " 'test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute.' " *Pacific Coast Fed. of Fishermen's Ass'ns v. Gutierrez,* 606 F.Supp.2d 1195, 1203 (E.D.Cal.2008) (quoting *Biodiversity Legal Found. v. Badgley,* 309 F.3d 1166, 1177 (9th Cir.2002)). The *Pacific Coast* court observed that "[t]here is considerable disagreement and confusion about what should be considered 'irreparable harm' for purposes of . . . injunctive relief proceedings. The Ninth Circuit has not articulated a standard or threshold at or above which ESA 'harm' is considered 'irreparable.' " *Pacific Coast,* 606 F.Supp.2d at 1207 (footnote omitted). However, "[a] court need not wait until the species is immediately threatened with extirpation to

issue injunctive relief." *Id.* (citing *American Rivers v. U.S. Army Corps of Eng'rs,* 271 F.Supp.2d 230, 258–59 (D.D.C.2003) "(injunction may issue if the number of individuals likely to be taken as a result of agency action during the time it will take to conclude the litigation will cause 'significant' harm to the species, even if there is 'not the remotest possibility that the planned agency activity ... would eradicate the species')"; *Swan View Coal., Inc. v. Turner,* 824 F.Supp. 923, 938 (D.Mont. 1992) "(threatened extinction not necessary for a finding of harm under the ESA)").[13]

The plaintiffs argue they have shown a likelihood of irreparable harm, pointing to the BiOp's finding that the dredging project will have adverse effects on five of the listed species and their critical habitat, "as well as kill or injure an indefinite number of juvenile members of these species." Dkt. # 6, p. 27 (citing BiOp at 14, 20). They argue this finding alone is sufficient under *Tennessee Valley Authority* to tip the balance in favor of issuing a preliminary injunction. They further assert that a strong public interest exists "'in preserving nature and avoiding irreparable environmental injury.'" Dkt. # 6, p. 29 (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1130 (9th Cir. 2011)) (citation omitted). They argue that any delay in the dredging project and its "potential limits to navigation due to the delay cannot outweigh ensuring the continued existence of listed salmon and steelhead ESUs." Dkt. # 6, p. 31.

The defendants argue the plaintiffs "cannot spend 26 pages attacking the BiOp as arbitrary and illegal—and then turn around and rely on the same BiOp to try to meet their burden of demonstrating irreparable harm." Dkt. # 19, p. 29. The defendants cite *Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987), for the proposition that "[h]arm is irreparable if it is 'permanent or of long duration.'" *Id.* (quoting *Village of Gambell* ). However, the Court in *Village of Gambell* did not define the term "harm" in those terms. In *dicta,* the Court noted:

> [The district court held] that "[i]rreparable damage is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action." [Citation omitted.] This presumption is contrary to traditional equitable principles and has no basis in [the Alaska National Interest Lands Conservation Act]. Moreover, the environment can be fully protected without this presumption. Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Village of Gambell,* 480 U.S. at 544–45, 107 S.Ct. at 1404.

The defendants further argue the plaintiffs' contention that "*any* adverse impact on a listed species—no matter how minor or temporary—constitutes irreparable harm ... fails as a matter of law." Dkt. # 19, p. 29 (citing Dkt. # 6, p. 28). The defendants argue the plaintiffs must show the proposed action would "jeopardize the continued existence of the species *as a whole.*" Dkt. # 19, p. 30 (emphasis in

---

**13.** Should the court ultimately conclude the defendants have violated the ESA, the burden would be on the defendants to prove the proposed action is non-jeopardizing. *Washington Toxics Coalition v. E.P.A.,* 413 F.3d 1024, 1035 (9th Cir.2005). However, the court does not so find at this stage of the proceedings. Accordingly, the burden remains on the plaintiffs to show a likelihood of irreparable harm.

original). The defendants note the plaintiffs, themselves, acknowledge that the ESA " 'does not prohibit all negative impacts on listed salmon and steelhead or their critical habitat; rather, it only prohibits agency actions that have the effect of jeopardizing an *entire* listed ESU or adversely modifying the conservation value of an *entire* critical habitat designation.' " *Id.* (quoting Dkt. # 6, p. 3; citing *id.*, p. 18).

The defendants argue the plaintiffs' assertion that the project's "minor adverse effects ... 'could prove disastrous' ... is precisely the kind of speculative allegation of *possible* harm that cannot, after *Winter*, support the issuance of an injunction." *Id.* They argue the plaintiffs have failed to show that irreparable harm is not only possible, it is *likely*, and therefore the plaintiffs' request for injunctive relief should be denied. *Id.*

The intervenor notes the plaintiffs have "concede[d] that standing alone the 'adverse impacts to the designated critical habitat' caused by the project are 'relatively modest.' " Dkt. # 14, p. 29 (quoting Dkt. # 6, p. 1). The intervenor argues the plaintiffs have ignored the ultimate finding in the BiOp that the proposed project "will not affect the abundance, productivity, and distribution of genetic diversity of any of the affected populations of the species. Therefore, it will not appreciably reduce the likelihood of survival and recovery of any of the listed species.' " *Id.* (quoting BiOp at 20). The intervenor further faults the plaintiffs for failing to offer an expert opinion or other evidence to challenge NMFS's conclusions set forth in the BiOp, instead proffering "only unsubstantiated and conclusory allegations of harm." *Id.*

In reply, the plaintiffs first attack the defendants' reliance on the District of Montana case, *Defenders of Wildlife v. Salazar*, "for the proposition that harm to the species justifying an injunction must be

'significant' to the overall population." Dkt. # 23, p. 18 (quoting Dkt. # 19, p. 29). The plaintiffs assert, "This is a higher standard than imposed by many other courts." *Id.* They cite three federal district court cases from the District of Columbia, one case from the District of Columbia Circuit, and one Ninth Circuit case in support of this proposition. *See id.* (citing *inter alia, Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1067–68 (9th Cir. 1996)) "(finding sufficient showing of harm to warrant permanent injunction against logging 237–acre forest tract that yielded 100 detections of murrelets from a listed three-state population estimated at 18,000 birds)." *Id.*

The plaintiffs return to their original argument that the BiOp itself is the best evidence of irreparable harm, where it indicates lower Columbia Chinook are at a "high risk" of extinction, and their population is in the "extirpated or nearly so" abundance category. *Id.* (citing BiOp at 6). They further note the BiOp's citation of the McElhany 2007 finding that " '[f]urther habitat changes in the Willamette River ... would likely have a significant effect on fall Chinook salmon.' " *Id.* (quoting BiOp at 6). They also again note the purportedly increased risk of extinction of the upper Willamette Chinook salmon from "high" in 2007, to "very high" in 2009. Dkt. # 23, p. 19. The plaintiffs close by observing that because NMFS has no way of determining the current, cumulative status of the ESUs based on the incremental impact of repeated incidental take authorizations, the actual status of the listed ESUs may be even more dire than reflected in the BiOp. *Id.*

In *Winter*, the Supreme Court made it clear that a plaintiff seeking injunctive relief must show more than "a possibility of irreparable harm." The Court held, "Issuing a preliminary injunction based only on a possibility of irreparable harm is incon-

sistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S.Ct. at 375–76 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) *(per curiam )); see Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1311 (9th Cir.2003) ("[T]he moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury.") (citations omitted).

Here, the plaintiffs have offered no more than speculation that irreparable harm will occur if an injunction is not issued. They have offered no scientific studies or expert opinions in support of their position. They argue NMFS should quantify its own ITSs issued over the past several years, without pointing to particular information in those ITSs that shows NMFS authorized cumulative incidental takes that actually placed the affected species in jeopardy. Merely saying the prior BiOps and ITSs are the "best science" regarding the status of the ESUs and critical habitat is not enough. The plaintiffs have failed to point to the information contained within those documents that they contend proves the listed ESUs are in jeopardy.

The court finds the plaintiffs have failed to prove that irreparable harm is likely to result if an injunction is not issued.

### CONCLUSION

Because the plaintiffs have failed to show either a likelihood of success on the merits or substantial questions going to the merits, and a likelihood of irreparable harm, their motion for a preliminary injunction is **denied.**

IT IS SO ORDERED.

